UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Akeem Fuller, *et al.*,

        Plaintiffs,                              Case No. 1:21cv451

        v.                                      Judge Michael R. Barrett

Warren County Educational
Service Center, *et al.*,

        Defendants.

## OPINION & ORDER

This matter is before the Court upon Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. 2). Defendants filed a Response in Opposition (Doc. 5); and Plaintiffs filed a Reply (Doc. 6).

On August 23, 2021, this Court held a hearing on Plaintiffs' Motion. (Doc. 18). At the hearing, Plaintiffs presented the testimony of Elizabeth Carpenter. (Doc. 21). After the hearing, the parties filed post-hearing briefs. (Docs. 24, 27, 29).

For the reasons that follow, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction is GRANTED.

**I.   BACKGROUND**

Plaintiffs Akeem Fuller, Nick Evans, and Mark Linquist are paraprofessionals at Laura Farrell Elementary School ("Farrell School"). (Doc. 1, ¶1). The Farrell School is located in Franklin, Ohio, and is operated by Defendant Warren County Educational Service Center ("WC ESC"). (Id., ¶ 14). WC ESC is a creation of state statute and supports school districts by meeting the needs of students who require specialized and

focused intervention and support. (Id., ¶ 9). The students at Farrell School have been identified as having severe emotional disabilities. (Doc. 11, Tom Isaacs Dep., PAGEID 314). There are one to two paraprofessionals in each classroom. (Id., PAGEID 316). Some paraprofessionals are not assigned to a classroom, but instead serve on a "Safety Care Team," which is a group of paraprofessionals who have a higher level of training to handle students who may be experiencing a "behavioral event." (Id., PAGEID 318).

Defendant Tom Isaacs is the superintendent and chief administrative officer of WC ESC. (Doc. 1, ¶ 10). Defendant Pat Paré is the Senior Executive Director of Human Resources and Business Operations of WC ESC. (Id., ¶ 11). Defendant Alisha Dean is the Program Supervisor at the Farrell School. (Id., ¶ 12). Defendant Wiley Collett is the Onsite Supervisor at the Farrell School. (Id., ¶ 13). Plaintiffs bring their claims against the individual defendants in both their personal and official capacities.

The following recitation of facts is largely gathered from Plaintiffs' Complaint. For purposes of Plaintiffs' Motion for Preliminary Injunction, Defendants have not disputed the factual background included here.

In the fall of 2020, while working at Farrell School, Plaintiffs wore clothing and face masks which communicated social or political messages, including: "Black Lives Matter," "I Can't Breathe," "Unapologetically Black," and "Down With Racism." (Doc. 1, ¶¶ 16, 18).

In September of 2020, Defendants Dean and Collett stopped Linquist in the hallway of the school. (Id., ¶ 18). Linquist was wearing a t-shirt with "Black Lives Matter" on it. (Id.) Collett informed Linquist that a parent had called the school and

2

complained about the message on his t-shirt. (Id.) Collett told Linquist to be "careful" and "mindful" of what he was wearing. (Id.)

Around that same time, Fuller wore a face mask with the message "I can't breathe," in reference to George Floyd's death in May 2020. (Doc. 8-1, Akeem Fuller Dep., PAGEID 176). The school nurse complained to Collet that she was offended and upset by the mask. (Doc. 15, Wiley Collett Dep., PAGEID 568-69). Collett approached Fuller and told him that the administration had received a complaint about the mask. (Doc. 8-1, Akeem Fuller Dep., PAGEID 177). Collett asked that Fuller to remove the mask. (Id.) Fuller complied. (Id. at PAGEID 178).

Soon thereafter, Evans wore a t-shirt to school with the phrase "8 Minutes – 46 Seconds" on it, referring to the length of time George Floyd was restrained by police officers during the incident which led to his death. (Id., ¶ 20). Evans was told to report to Dean's office. (Id.) Dean informed Evans that someone from the adjacent neighborhood had seen Evans walking close to the school premises while wearing the shirt and called to complain that the t-shirt was offensive and should not be worn in or near a school setting. (Id.) Dean explained to Evans that the school "cannot be political." (Id.) Dean told Evans that he could either remove the shirt, or wear it inside out. (Id.) Fearing discipline, Evans wore the t-shirt inside out to hide its message. (Id.)

In October of 2020, Fuller and Linquist met with the WC ESC administration to discuss the prohibition on messages regarding racism, police brutality, and racial inclusion. (Id., ¶¶ 21, 23). WC ESC administration told Fuller and Linquist that WC ESC would not alter its position on the subject. (Id., ¶ 23).

Plaintiffs bring the following claims: (1) violation of the Free Exercise Clause of

3

the First Amendment; (2) viewpoint discrimination in violation of the First Amendment; (3) prior restraint in violation of the First Amendment; (4) disparate discriminatory impact in violation of the Equal Protection Clause of the Fourteenth Amendment; and (5) "disparate treatment."

In their motion, Plaintiffs seek to enjoin Defendants from imposing restrictions on their right to exercise freedom of speech by wearing clothing and accessories that display social or political messaging. (Doc. 2). Plaintiffs explain that even though the motion for injunctive relief is predicated on violations of the Free Exercise Clause of the First Amendment, they have not abandoned their claims that the school enforced its speech policies more stringently and discriminatorily against African American employees in violation of the Equal Protection Clause of the Fourteenth Amendment. (Doc. 29, PAGEID 990).

## II. ANALYSIS

### A. Standard of Review

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943-44 (2018)). These four factors are "to be balanced, not prerequisites that must be met." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1984)). However, a preliminary injunction is "extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances

4

clearly demand it." *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## B. Likelihood of success on the merits

### 1. 42 U.S.C. § 1983

Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Tuttle v. Oklahoma City*, 471 U.S. 808 (1985). Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights. *Flint v. Kentucky Dept. of Corrections*, 270 F.3d 340, 351 (6th Cir. 2001) (citing *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) and *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir. 1992)). In addition, WC ESC cannot be found liable unless Plaintiffs "can establish that an officially executed policy, or the toleration of a custom within the school [ ] leads to, causes, or results in the deprivation of a constitutionally protected right." *See Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Plaintiffs' official-capacity claims against the individual Defendants in this case "represent only another way of pleading an action against an entity of which an officer is an agent." *See Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). In contrast, the personal-capacity suits against the individual Defendants "seek to impose personal liability upon a government official for actions he takes under color of state law." *Id*.

Here, because the parties have provided no discussion of these topics, the Court assumes for purposes of deciding the motion that the parties agree that the individual Defendants were acting under the color of state law; and that the WC ESC is subject to

liability pursuant to an officially executed policy or custom. The only dispute is whether Defendants' actions violated Plaintiffs' First Amendment rights.

### 2. **First Amendment**

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. Amend. I. Even though Plaintiffs state that the motion for injunctive relief is based the First Amendment, and not their equal protection claim, they repeatedly conflate the two claims. For example, at one point, Plaintiffs argue that "Defendants' policy and practice of targeting Black Paraprofessionals and limiting what messaging and clothing can be worn on their person has deprived them of fundamental First Amendment rights." (Doc. 2, PAGEID 29). At the hearing, and in the post-hearing briefing, the parties seem to add new theories and arguments regarding whether Defendants' policy is unconstitutionally vague, or overbroad (see, e.g., Doc. 21, PAGEID 658), but these claims were not set forth in the Complaint.

To make the Court's analysis more challenging, it is not clear from the pleadings the exact policy which is being challenged. In a footnote in Plaintiffs' Complaint, Plaintiffs reference WC ESC's dress code, which provides that the administration has "the right to specify appropriate dress and grooming guidelines for all employees;" and requires employees to report to work "physically clean, neat, modest, and well groomed, and in a manner consistent with community standards." (Doc. 1, PAGEID 6).[1] In their post-hearing briefing, Plaintiffs cite the "Controversial Issues" section of the WC ESC employee handbook, which provides:

---

[1] This language seems to differ from the "Dress Code and Personal Care" policy found in the "Warren County Learning Center" Employee Handbook, 2020-2021, provided by Defendants, which states that "Dress is expected to be clean, professional and employees will maintain a business causal look. ... Clothing that is distracting is not permitted during business hours." (Doc. 5-8, PAGEID 70).

6

> It is not possible to avoid all issues that will offend some students, parents, or some members of the community.  Exposure to controversial issues can be an important learning tool for students, especially as they get older and closer to voting and other rights and obligations of citizenship. Teachers must receive prior permission to discuss or teach controversial issues from the supervisor and are encouraged to share such information with parents before doing so.  As a general rule, WC ESC employees must avoid instructional materials that use profanity, vulgarities, and sexual themes.  Employees must demonstrate respect for various religious and political views, and the ultimate right of parents to determine their child's exposure to these issues.  From time to time, it may be necessary to provide alternative educational materials to students whose parents object to a particular educational topic.  Most importantly, WC ESC employees are required to avoid all actions and behaviors that may offend any client school districts.

(Doc. 23-1, PAGEID 825; Doc. 5-8, PAGEID 79).  Plaintiffs also cite to the following deposition testimony from Christina Even, the Senior Executive Director of Student Services and Programs:

> Q: All right. What is the policy of Warren County Education Center with respect to the wearing of articles of clothing or face masks which contain social or political messaging?
>
> A: We enforce the policy that we are neutral and that we do not wear any controversial language on any articles of clothing --
>
> Q: Okay.
>
> A: -- or masks.
>
> Q: What is the definition of controversial?
>
> A: Anything that would impede the learning environment.

(Doc. 13, Christina Even Dep., PAGEID 472).  Michael Bidwell, the director of social emotional learning at WC ESC testified that employees are to take questions about what is "controversial" to the leadership team for a decision on what messaging is or is not considered controversial. (Doc. 14, Michael Bidwell Dep., PAGEID 536).

It is from this testimony that the Court has been able to glean the heart of

7

Plaintiffs' claim and ultimately, the basis for granting injunctive relief. To wit, Plaintiffs challenge Defendants' policy which bans employees from wearing any clothes or accessories with controversial social or political messages.

The parties appear to agree that the proper analysis is the balancing test set forth in *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). That being said, there are references throughout the parties' briefing to viewpoint discrimination, which is relevant to a public forum analysis, but has no application in the analysis which applies to public employee speech under *Pickering*. *See Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cty.*, 513 F. Supp. 3d 593, 621 (W.D. Pa. 2021) ("Content and viewpoint discrimination are concerns that ordinarily arise where the government restricts speech in public forums, not in the workplace.") (citing cases).[2]

As the Supreme Court explained in *Pickering*, the government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education*, 391 U.S. at 568; *see also Waters v. Churchill*, 511 U.S. 661, 671-72, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994) (explaining that "the government as employer indeed has far broader powers than does the government as sovereign" so that "even many of the most fundamental maxims of our First Amendment

---

[2]Moreover, Defendants' policy is not content neutral. "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). Here, Defendants' ban applies to a certain type of message on employees' clothing or accessories—social or political messages which are "controversial." A determination of what is controversial necessarily requires a reference to the content of the speech.

jurisprudence cannot reasonably be applied to speech by government employees.") (citations omitted). However, public employees "do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). As a result, "the First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Lane v. Franks*, 573 U.S. 228, 231 (2014) (quoting *Pickering*, 391 U.S. at 568).

The Sixth Circuit has distilled these principles into a three-step inquiry to determine whether speech by a public employee is protected by the First Amendment:

> First, we ascertain whether the speech addressed a matter of public concern. [*Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017)] (citing *Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Second, we determine whether the employee spoke as a private citizen or as an employee pursuant to her official duties. *Id*. (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). Third, we balance the interests of the parties and determine if the employee's speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*. (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

*Buddenberg v. Weisdack*, 939 F.3d 732, 739 (6th Cir. 2019).

The question of whether an employee spoke as a citizen on a matter of public concern is a question of law for the court to decide. *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004). "When speech relates 'to any matter of political, social, or other concern to the community,' it addresses a matter of public concern." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684). For

9

purposes of making this determination, the "inappropriate or controversial character of a statement is irrelevant." *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987). Indeed, discussion on matters of public concern may "'well include vehement, caustic, and sometimes unpleasantly sharp attacks ...'" *Rankin*, 483 U.S. at 387, 107 S.Ct. at 2898 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)). For example, in *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Supreme Court held that a clerical employee spoke on a matter of public concern when she said "if they go for him again, I hope they get him" after learning of an attempt on President Reagan's life, because her comments were "made in the course of a conversation addressing the policies of the President's administration." *Id*. at 381. Here, the Court notes that there is little doubt that the issues raised as part of the "Black Lives Matter" movement or the widespread protests of the killing of George Floyd are matters of significant public concern.

Next, the Court must examine the content and context of Plaintiffs' speech to determine whether Plaintiffs spoke as private citizens, or pursuant to their professional duties. *See Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010). "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240. Here, there appears to be no dispute that Plaintiffs' speech was made as private citizens, versus within scope of their duties. (See Doc. 29, PAGEID 980). Plaintiffs worked as paraprofessionals at the Farrell School. Making statements regarding the Black Lives Matter movement or the killing of George Floyd were not within the scope of their duties.

The Sixth Circuit has recently instructed that "[b]efore applying the balancing test, it is appropriate to begin this analysis by determining the degree of protection the speech warrants, *i.e.*, the level of importance the speech has in the community." *Bennett v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 977 F.3d 530, 538 (6th Cir. 2020), *cert. denied*, 141 S.Ct. 2795, 210 L.Ed.2d 928 (2021). The Sixth Circuit explained why this was a key part of the analysis:

> Central to the concept of protecting the speech of government employees is the idea that public employees are the most likely to be informed of the operations of public employers and that the operation of such entities is "of substantial concern to the public." *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007) (quoting *City of San Diego v. Roe*, 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004)); *see also Garcetti*, 547 U.S. at 419, 126 S.Ct. 1951. "Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986) (per curiam). Here, even if we consider Bennett's speech to include her comment on the election, we must consider the public's interest—or lack thereof—in receiving the information she shared. Compare Bennett's comment on the election—of which she had no special insight—to the litany of cases protecting speakers that are exposing inner workings of government organizations to the public. *See*, *e.g. Banks*, 330 F.3d at 897 (finding that a board of education engaging in illegal hiring practices is a "concern to the community"); *City of Elyria*, 502 F.3d at 492 (holding that operations of public employers "are of substantial concern to the public," and thus, a public employee's right to comment on such matters are protected).

*Id*. at 539 (footnote omitted). Here, Plaintiffs are not exposing any inner workings of their government employer which are of substantial concern to the public. Because their speech involves a lower level of protection, the balancing test requires less of a showing of disruption by Defendants. *Accord Bennett*, 977 F.3d at 539 (citing *Connick*, 461 U.S. at 152, 103 S.Ct. 1684).

When considering the disruption to the effective functioning of the government office, the "pertinent considerations" are whether the statement "(a) impairs discipline by

11

superiors or harmony among co-workers, (b) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, (c) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise, or (d) undermines the mission of the employer." *Bennett*, 977 F.3d at 539 (quoting *Rankin*, 483 U.S. at 388 and *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)) (cleaned up). To be clear, "a public employer need not show actual disruption of the public agency in all cases in order to prevail under the *Pickering* balancing test. Instead, when the employer does not offer such evidence, we must assess whether the employer could reasonably predict that the employee speech would cause disruption in light of the manner, time and place the speech was uttered, as well as the context in which the dispute arose." *Gillis v. Miller*, 845 F.3d 677, 687 (6th Cir. 2017) (internal quotation marks and citations omitted).

The Court now turns to applying the balancing test. Neither party has addressed whether this Court should apply the modified *Pickering* analysis described in *United States v. National Treasury Employees Union* ("*NTEU*"), 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).[3] However, the Court finds that based upon the pleadings and the evidence in the record, this modified *Pickering* test applies here.

In *NTEU*, the Supreme Court addressed the constitutionality of a law which acted as a "wholesale deterrent to a broad category of expression by a massive number of

---

[3] Plaintiffs' failure to address this analysis is inexplicable. As one district court has observed: "The NTEU test is particularly onerous to the government employer." *Int'l Ass'n of Firefighters Loc. 3233 v. Frenchtown Charter Twp.*, 246 F. Supp. 2d 734, 740 (E.D. Mich. 2003).

12

potential speakers." 513 U.S. at 467, 115 S.Ct. 1003 (footnote omitted).[4] In contrast, "the *Pickering* framework was developed for use in a very different context—in cases that involve 'one employee's speech and its impact on that employee's public responsibilities.'" *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472, 201 L.Ed.2d 924 (2018) (quoting *United States v. Treasury Emps.*, 513 U.S. 454, 467, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995)). As the Supreme Court has explained:

> While we have sometimes looked to *Pickering* in considering general rules that affect broad categories of employees, we have acknowledged that the standard *Pickering* analysis requires modification in that situation. *See* 513 U.S., at 466–468, and n. 11, 115 S.Ct. 1003. A speech-restrictive law with "widespread impact," we have said, "gives rise to far more serious concerns than could any single supervisory decision." *Id*., at 468, 115 S.Ct. 1003. Therefore, when such a law is at issue, the government must shoulder a correspondingly "heav[ier]" burden, *id*., at 466, 115 S.Ct. 1003, and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights, *see id*., at 475–476, n. 21, 115 S.Ct. 1003; *accord*, *id*., at 482–483, 115 S.Ct. 1003 (O'Connor, J., concurring in judgment in part and dissenting in part). The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis.

*Id*. This modified test under *NTEU* requires the government to "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468, 115 S.Ct. 1003 (quoting *Pickering*, 391 U.S. at 571, 88 S.Ct. 1731). To carry this burden, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and

---

[4] *NTEU* involved a statute which prohibited federal employees from accepting any compensation for giving speeches or writing articles, even when the topic was unrelated to the employee's official duties. 513 U.S. at 457, 115 S.Ct. 1003.

material way." *NTEU*, 513 U.S. at 475, 115 S.Ct. 1003 (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

With regard to the identified harms, Defendants maintain that the fact that a parent, co-worker and community member complained about the messages on Plaintiffs' shirts demonstrates Plaintiffs' messages interfered with the school's instructional services. Defendants also point to the volatility of the student population at Farrell School, and the concern that Plaintiffs' messages would trigger an outburst from a student.

As the Court understands the evidence in the current record, Plaintiffs' clothing and accessories prompted one complaint from a parent, one complaint from Plaintiffs' co-worker, one complaint from a community member and no student outbursts. The Court will now elaborate.

As to student outbursts, Isaacs testified in his deposition that to his knowledge, Plaintiffs' clothing and accessories did not trigger any disruption, violence or disobedience from students. (Doc. 11, Tom Isaacs Dep., PAGEID 368-370).[5] However, Isaacs testified that based on his weekly meetings with the school superintendents in Warren County, there was some concern in the spring of 2020 regarding disruption to school operations. (Isaacs Dep., PAGEID 98). As Isaacs explained: "in general, the issues relative to COVID, vaccinations, masking, social distancing, America cities burning due to concerns with racial issues, concerns relative

---

[5]The Court's finding on this point is in no way meant to undermine Isaac's testimony that: "over the many years that that program has existed, I have personally witnessed many acts of violence from students toward employees. And I have personally witnessed and also heard from my various leaders through the years, that any type of distraction causes classrooms to be off task and student learning to be disrupted." (Isaacs Dep., PAGEID 359). Instead, the Court finds that there is no evidence in the current record that Plaintiffs' clothing or accessories caused a student outburst.

to a very emotional Presidential election, all spilled into a heightened level of concern for school safety and school -- school operations." (Isaacs Dep., PAGEID 98). Nevertheless, Isaacs also testified that because WC ESC serves more than one school district, predicting the impact of a particular message was difficult. (Isaacs Dep., PAGEID 100). Isaacs explained: "because there are so many different views and different cultures in school districts, that the most important thing that our office can do is to remain neutral and not take political positions. And we do take that into consideration, along with whether political messages disrupt the learning climate or potentially create safety circumstances for our employees and our students." (Isaacs Dep., PAGEID 100). The Court notes that while Defendants concerns for safety are real, there is nothing in the current record which would establish that the ban on controversial messages on clothing and accessories "will in fact alleviate these harms in a direct and material way." *See NTEU*, 513 U.S. at 475, 115 S.Ct. 1003. As Isaacs himself testified: "the reason that disruptions happen in the school is because I have a school filled with students who have psychiatric disorders and severe emotional disabilities, and we don't know what triggers them." (Isaacs Dep., PAGEID 371).

As to the complaint from Plaintiffs' co-worker, Collett explained that the school nurse, Lora Torrence, told him that she was offended and upset by Fuller's face mask with the message "I can't breathe." (Doc. 15, Wiley Collett Dep., PAGEID 568-69). However, Torrence did not explain why she was offended, or ask that Collett take any action. (Collett Dep., PAGEID 569). Instead, Torrence explained to Collett that she thought Fuller was wearing the mask to cause a disruption or as a political move. (Collett Dep., PAGEID 569). The Court notes that even though Torrence may have

been offended, this evidence does not indicate that the message on Fuller's face mask impaired harmony among co-workers or had a detrimental impact on a close working relationship at the Farrell School.

Finally, as to the complaint from the parent, the nature of the complaint was that the parent did not agree with the message on the shirt and thought that a parent should be the one to have a conversation with their child about these issues. (Doc. 16, Alisha Dean Dep., PAGEID 615). The Court notes that the WC ESC Employee Handbook provides that "[e]mployees must demonstrate respect for various religious and political views, and the ultimate right of parents to determine their child's exposure to these issues." However, as Isaac explained, the parent concerns regarding Plaintiffs' clothing and accessories came back to safety concerns, not concerns regarding the right of parents to control their child's exposure to certain viewpoints:

> Q . . . why did you care that parents had registered some complaints?
>
> A The reason that I care is because that is a building that is frequently violent and frequently has disruptions to the learning climate.
>
> And so I care about a positive learning climate where students are in class, not in a padded room, not hitting my employees or biting my employees. And so anything that I consider to be disruptive, are issues that are important to me.

(Doc. 11, Isaac Dep., PAGEID 361).[6] There is no doubt that creating a positive learning

---

[6] Defendants cite to the decision in *Mayer v. Monroe Cty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) in support of their argument that school administrators have the ability to restrict teachers' expression of their own viewpoint. This Court finds that Plaintiffs' case arises in a different context and is distinguishable from *Mayer*. In *Mayer*, the Seventh Circuit placed great weight on the notion that "the school system does not 'regulate' teachers' speech as much as it hires that speech. Expression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary." *Id*. at 479. While paraprofessionals certainly have some influence over the students, in this case, "speech was not what the employee was being paid to create." *Id*. The court in *Mayer* also noted that "the pupils are a captive audience." These factors led the court to conclude that "the first amendment does not entitle

16

climate at the Farrell School is a difficult task, but as the Court has already observed, there is no evidence in the current record that the messages on Plaintiffs' clothing and accessories interfered with the regular operation of the Farrell School.  In fact, Christina Even testified that she was not aware of any message worn by a teacher, staff member or student which resulted in a disruption of regular school activities at Farrell School. (Doc. 13, Christy Even Dep., PAGEID 487).  Moreover, the parent who called to complain did not identify themselves, and only left a voicemail about Linquist's shirt. (Collett Dep., PAGEID 568).  Similarly, the community member who called to complain about Evans' shirt also made the call anonymously and provided little information regarding the nature of the complaint.  (Doc. 16, Alisha Dean Dep., PAGEID 623-24). There is no evidence that there was further discussion with the parent or the community member, or that these callers took any other action other than leaving anonymous messages.  Therefore, there is nothing in the record at this stage of the proceedings which establishes that Plaintiffs' clothing and accessories will cause harms that are "real, not merely conjectural."  *See NTEU*, 513 U.S. at 475, 115 S.Ct. 1003.  As the Supreme Court has noted: "Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women.... To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced." *NTEU*, 513 U.S. at 475, 115 S.Ct. 1003 (quoting *Whitney v. California*, 274 U.S. 357, 376, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927)

---

primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system." *Id*. at 480.  Here, Plaintiffs are not conducting the education of a captive audience and were not hired to teach an established curriculum.

(concurring opinion)).[7]

Accordingly, the Court finds that based on the current record, Defendants have not carried their burden of demonstrating that the challenged policy is necessary to the efficient operation of Farrell School so as to outweigh Plaintiffs' interests in commenting upon matters of public concern. Therefore, it is likely that the policy banning employees from wearing any clothes or accessories with controversial social or political messages is an unconstitutional infringement on the First Amendment rights of Plaintiffs. Because Plaintiffs have established a likelihood of success on the merits of their First Amendment claim, the Court finds that this factor weighs in favor of the granting of injunctive relief.

C. **Irreparable injury**

It is well-settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)); *see also Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (explaining that "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated."). Therefore, this factor weighs in favor of the granting of a preliminary injunction.

---

[7]The Court notes that Defendants cited to the decision in *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 335 (6th Cir. 2010) for the proposition that actual disruption need not occur in order to uphold restrictions on speech in schools. To begin, the Court notes that *Defoe* was a case involving student speech and the analysis was based on the "substantial disruption" test found in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). While the Sixth Circuit found that school officials reasonably forecasted that permitting displays of the Confederate flag would substantially disrupt or materially interfere with the school environment, under the facts the case, there was already racial tension at the school that had led to earlier outbursts of violence even before the display of the flag, which is widely regarded as racist and incendiary. Similar evidence is not in the record in this case.

### D. Substantial harm to others

The Sixth Circuit has explained: "if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment." *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012) (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)). Because there is no evidence in the record to the contrary, the Court finds that this factor weighs in favor of the granting of injunctive relief.

### E. Public interest

"The public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties." *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009). However, "the determination of where the public interest lies also is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distributing Co.*, 154 F.3d at 288. Because the Court concludes that Plaintiffs have shown a likelihood of success on their First Amendment claim, the Court finds that the granting of an injunction is in the public interest.

## III. CONCLUSION

Based on the on the foregoing, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2) is **GRANTED**. Defendants are hereby preliminarily enjoined from enforcing the policy banning employees from wearing any clothes or accessories with controversial social or political messages. Federal Rule of Procedure

65(c) provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While the language of Rule 65(c) appears to be mandatory, the rule in the Sixth Circuit "has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Neither party has addressed this issue or set forth any potential financial burden on Defendants. Therefore, the Court concludes it is appropriate to not require security in this case and will not require Plaintiffs to post a bond.

**IT IS SO ORDERED.**

*/s/ Michael R. Barrett*
JUDGE MICHAEL R. BARRETT